IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BERNARD JONES,  ALCOHOL AND DRUG COUNSELING SERVICES, LLC, HEALING CIRCLE RECOVERY COMMUNITY, INC., | **4:09CV3264** |
| Plaintiffs, | **MEMORANDUM OPINION ON REMAND** |
| vs. | |
| DR. RICK MCNEESE, Nebraska Department of Correctional Services, Assistant Administrator of Behavioral Health-Substance Abuse, Individually; | |
| Defendant. | |

This matter is before the court on remand from the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit"), Filing No. 78, Eighth Circuit Opinion ("Opinion").  The Eighth Circuit asks "for a more detailed consideration and explanation of the validity, or not, of the defendant's claim to qualified immunity."[1]  *Id.,* Opinion at 8. Further, it asks that the court address the issue of "whether each plaintiff has standing to assert each distinct claim under section 1983."[2]  *Id.* at 7 n.2.

This is an action for race discrimination and denial of due process in connection with certain actions taken by Richard McNeese, Ph. D. ("Dr. McNeese"), then employed as Assistant Administrator of Behavioral Health-Substance Abuse at the Nebraska Department of Correctional Services ("Department of Corrections").  Dr. McNeese allegedly removed plaintiff Bernard Jones and the businesses that he owned and

---

[1] The Eighth Circuit also found that "to the limited extent Dr. McNeese also argue[d] that the summary judgment evidence [did] not establish a '"genuine" issue of fact for trial,' [it] lack[ed] jurisdiction to review the challenge."  Filing No. 78, Opinion at 4.

[2] The Eighth Circuit found it unclear "who is alleging the claims and seeking to recover," and questioned "whether each plaintiff has standing to assert each distinct claim under § 1983."  Filing No. 78, Opinion at 7 n.2.

operated, plaintiffs Alcohol and Drug Counseling Services, LLC ("ADCS"), and Healing Circle Recovery Community, Inc. ("Healing Circle"), from a list of providers that had been approved to provide parolees and probationers with substance abuse counseling services paid through vouchers issued by either the Nebraska Department of Corrections or the Nebraska judicial system.

In his motion for summary judgment, Dr. McNeese argued: 1) that the plaintiff's businesses, ADCS and Healing Circle, were not named in the complaint and were not proper parties to the case under the federal rules; 2) that Jones could not establish a claim under 42 U.S.C. § 1981 because he failed to establish discriminatory intent and failed to establish that Jones had engaged in a protected activity; 3) that Jones could not establish a claim for an equal protection violation or a deprivation of liberty without due process under § 1983, because he "[had] failed to establish conduct that somehow deprived him of rights, privileges or immunities secured by the Constitution;" and 4) Dr. McNeese was immune from suit and from an award of damages under the doctrine of qualified immunity. Filing No. 58, Defendant's Brief at 15-26, 30-33. In compliance with the local rule requiring counsel to list uncontroverted facts in support of a motion for summary judgment, McNeese set out 65 numbered paragraphs of purportedly uncontroverted facts. *Id.* at 2-14. McNeese also submitted depositions, affidavits, and exhibits. Filing No. 59 & Filing No. 60, Indices of Evid., Exs. 1-34.

In response, the plaintiffs controverted virtually all of the defendant's material contentions. Filing No. 61, Plaintiffs' Brief at 5-17. The plaintiffs argued that Dr. McNeese was not entitled to judgment as a matter of law because there were genuine issues of material fact on issues determinative of the claims. *Id.* at 18. The plaintiffs

submitted competing deposition testimony, documents and answers to interrogatories in support of their position.  *See* Filing Nos. 62 & 63, Exs. 1-2.  Subsequent to the filing of the motion for summary judgment, the parties attended a pretrial conference, resulting in a pretrial order that supersedes the pleadings and establishes the controverted issues for trial.[3]  Filing No. 70, Pretrial Order.

_____

[3] In the Pretrial Order, controverted issues were identified as follows:

(1) Whether the actions of Defendant constitute a violation of 42 U.S.C. §1983; whether Plaintiff was treated differently than similarly situated white individuals on the basis of his race in violation of his right to equal protection afforded through the Fourteenth Amendment of the United States Constitution.

(2) Whether Plaintiff suffered a deprivation of his Liberty interest without the Due Process afforded through the Fourteenth Amendment of the United States Constitution;

(3) Whether Plaintiffs have been stigmatized and precluded from practice in their chosen profession of alcohol/drug counseling.

(4) Whether the actions of Defendant constitute a violation of 42 U.S.C. § 1981;

(5) Whether Plaintiff has been limited in his ability to contract for the voucher program and discriminated against because of his race.

(6) Whether Plaintiff has established discriminatory intent on the part of Defendant; whether Plaintiff has established engagement in a protected activity; whether Plaintiff has established interference with a protected activity by Defendant.

(7) Whether Plaintiff is entitled to an award of damages.

(8) If Plaintiff is entitled to an award of damages, the nature and extent of the damages.

(9) Whether Plaintiff is entitled to costs and attorney fees.

(10) Whether Defendant at all times acted reasonably and in good faith and is immune from suit and an award of damages against him in his individual capacity under the doctrine of qualified immunity.

(11) If Plaintiff is entitled to an award of damages, whether Plaintiff failed to mitigate his damages.

(12) Whether Alcohol and Drug Counseling Services, LLC, and Healing Circle Recovery Community, Inc. are parties to this case.

Filing No. 70, Order on Pretrial Conference at 2-3.

I.  FACTS

The evidence submitted in connection with the motion for summary judgment shows that at the time of the events at issue, Dr. McNeese was the administrator of substance abuse treatment at the Department of Corrections.  Filing No. 60, Index of Evid., Ex. 24, Affidavit of Dr. Rick McNeese ("Dr. McNeese Aff.") at 1.  Dr. McNeese's wife owns First Step Recovery, Inc. ("First Step"), and First Step Wellness Services, Inc., a nonprofit corporation.  Filing No. 63, Index of Evid., Defendant's Answers to Interrogatories at 1.  In 2007, in a publication connected to his college alma mater, Dr. McNeese indicated that he was President and Clinical Director of First Step.  Filing No. 64, Index of Evid., Declaration of Joy Shiffermiller ("Shiffermiller Decl."), Ex. 2, Deposition of Dr. Richard McNeese ("Dr. McNeese Dep.") at 63 (Doc # 64-1, Page ID # 1003).  First Step had contracts with the State of Nebraska to provide substance abuse treatment services.  *Id.* at 65 (Doc # 64-1 Page ID # 1005).  Dr. McNeese acknowledged that he worked at First Step as a consulting psychologist while he was working at the Department of Corrections.  *Id.* at 57 (Doc # 64-1, Pg ID # 997).

Jones was employed by the Department of Corrections from 1991 to 2007 as a substance abuse counselor.  Filing No. 60, Index of Evid., Ex. 25, Deposition of Bernard Jones ("Jones Dep.") at 46-47.  The evidence shows that while employed at the Department of Corrections, he met or exceeded expectations.  Filing No. 62, Index of Evid., Shiffermiller Decl., Ex. 53, Personnel File Excerpts at 6 (Doc # 62-2, Page ID # 953).  Jones testified that, as part of his substance abuse counselor training, he did a practicum or internship at First Step in 1998. Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 48.  In 2000, Dr. McNeese hired Jones to work at Antlers, a residential

substance abuse treatment program that had partnered with First Step in a bid for a federal contract.  *Id.* at 52-54.  Jones testified that Dr. McNeese told Jones in 1999 that Dr. McNeese wanted to hire Jones to attract more black clients.  *Id.* at 54-55.  He also testified that after Jones became employed at the Department of Correctional Services as a licensed substance abuse counselor, Dr. McNeese called Jones into his office and asked him to assist him in finding "people of color" to become substance abuse counselors.  *Id.* at 241-42.  Jones testified he perceived the comment to be  racist.  *Id.* at 243.

In 2005 or 2006, Jones approached Dr. McNeese about a treatment concept Jones was pursuing called the "Healing Circle Recovery Community."  *Id.* at 34.  Jones intended to establish Healing Circle and work there while he was employed at the Department of Corrections.  *Id.* at 87.  Jones testified that Dr. McNeese told him he could not continue to develop the concept for the business while working at the Department of Corrections.  *Id.* at 79.  Jones stated that Dr. McNeese told him that he would be fired if he did so.  *Id.* at 88.  Dr. McNeese stated in an affidavit that he made no such statement to Jones.  Filing No. 60, Ex. 24, Dr. McNeese Aff. at 2.

Jones also testified that he had gotten approval to perform outside work in the past, so he asked Larry Wayne, a supervisor, if there was anything he could do to proceed with his plans to establish Healing Circle.  Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 88.  Wayne told him to ask the Legal Department and the Legal Department later informed him that there would not be a conflict of interest if Jones worked at Healing Circle and at the Department of Corrections since Healing Circle

would be a treatment center for women, and Jones only worked with men at the Department of Corrections.  *Id.* at 88-89.

Dr. McNeese testified that two other Department of Corrections employees, Dr. Kamal and Ken Mausbach, who are not black, were allowed to work at both the Department of Corrections and at First Step.  Filing No. 64, Ex. 2, Dr. McNeese Dep. at 57-59.  Dr. Kamal, a psychiatrist, was a consulting psychiatrist at First Step while employed by the Department of Corrections.  *Id.* at 57.  Ken Mausbach, a mental health therapist, was a part-time contracting mental health therapist with First Step and was also on staff at the Department of Corrections.  *Id.* at 58.  Kamal is Pakistani, Mausbach is white.  *Id.*

Healing Circle was incorporated in 2004, and accepted its first clients in 2008. Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 39 (Doc #60-8, Page ID # 502-03). When Jones retired from the Department of Corrections in 2007, he set up ADCS, an outpatient treatment center for men.  *Id.* at 103.  Jones testified that he incorporated the businesses on his own, without the help of an attorney.  *Id.* at 80.

ADCS received vouchers from the Department of Corrections as payment for addiction treatment services.  Filing No. 64, Ex. 2, Dr. McNeese Dep. at 57 (Doc # 64-1, Pg ID # 997).  ADCS got 99% of its funding from the Department of Corrections.  Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 103 (Doc #60-8, Page ID # 566).  Jones testified Dr. McNeese was directly responsible for payments to the company.  *Id.* at 103-04.  Treatment for women at the Healing Circle was funded through either parole or probation.  *Id.* at 105.  While the Healing Circle was operative, Jones was generally paid through the voucher system.  *Id.* at 96.  Jones testified that being on the criminal justice

provider list was an absolute necessity in order to provide treatment for any offenders paid with vouchers from either the Department of Corrections or the judicial system.  *Id.* at 105.

Jones stated that he was allowed by the Department of Corrections to visit facilities and to give presentations to male inmates for ADCS and to women inmates for Healing Circle Recovery Community.  *Id.* at 99.  He testified he also solicited business by posting and distributing fliers.  *Id.* at 99.

On June 29, Kris Parsons, a chemical dependency counselor supervisor, reported to Dr. McNeese that Jones had been at a community corrections facility to speak to inmates interested in attending intensive outpatient treatment at his treatment center.  Filing No. 62, Ex. 1, Shiffermiller Decl., Ex. 67 at 3 (Doc # 62-3, Page ID 970). Dr. McNeese responded with an email to the administrators of probation and parole services reporting what he characterized as the "highly inappropriate practice by Jones" of "using his knowledge of [the Department of Corrections] and previous professional relationships to obtain access to the inmate population and to manipulate inmates into signing an agreement."  *Id.* at 2 (Doc # 62-3, Page ID 969).  Noting the potential of an inappropriate power relationship, Dr. McNeese stated the very serious violation called for immediate action due to the ethical breach.  *Id.*  He also referred to involvement of the Legal Department.  *Id.*  Dr. McNeese later sent an e-mail to probation and parole services administrators stating, "[p]ending further investigation based on reports of an unauthorized meeting with inmates and a procedure that has inmates sign the attached document [a medical release form], I am discontinuing vouchers to Alcohol and Drug

Counseling due to several concerns." Filing No. 64, Ex. 2, McNeese Dep. at 87 (Doc # 64-1, Page ID # 1027).

Prior to the email, ADCS and Healing Circle had received the most vouchers, and First Step the second-most. Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 247. At or near the time Dr. McNeese sent the e-mail, the Department of Corrections was soliciting bids for a sole provider contract. Filing No. 64, Index of Evid., Ex. 2, Dr. McNeese Dep. at 65-68 (Doc #64-1, Page ID #1005-08). Because Jones and his businesses had been suspended from the voucher program and were no longer on the provider list, neither ADCS nor Healing Circle could submit a bid. *Id.* at 90; Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 160. First Step submitted a bid and was ultimately awarded the contract to provide addiction recovery services to the Department of Corrections as the sole provider. Filing No. 64, Ex. 2, McNeese Dep. at 84, 90, 69-70. Shortly thereafter, Dr. McNeese was put on administrative leave and later resigned. Filing No. 64, Ex. 2, McNeese Dep. at 83, 91 (Doc # 64-1, Page ID # 1023). Newspaper reports showed that Dr. McNeese was investigated for a conflict of interest after an audit revealed that a contract had been awarded to First Step and it became known that Dr. McNeese's wife owned First Step. Filing No. 64, Ex. 2, Dr. McNeese Dep., Ex. 14 (Doc # 64-3, Page ID # 1034); *see also* Filing No. 60, Ex. 25, Jones Dep. at 161 (Doc # 60-8, Page ID # 624).

Jones was given numerous conflicting explanations for the exclusion of ADCS and Healing Circle. *Id.* at 146; Filing No. 62, Ex. 1, Shiffermiller Decl., Ex. 68, Minardi documents at 2-3, 9-11 (Doc # 62-4, Page ID # 975-76, 982-84). Jones testified he was told by numerous State of Nebraska employees that he was under investigation. *Id.* at

106 to 108.  He stated he was told by State of Nebraska employees that Rick McNeese had contacted them and told them that Jones had violated the contract, had done fraudulent work, had stolen or gotten information from inmates illegally, and had entered correctional facilities illegally.  Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 112.  The directive suspending Jones, ADCS and Healing Circle from the voucher program was never rescinded.  Filing No. 64, Index of Evid., Ex. 1, Shiffermiller Decl., Ex. 2, Dr. McNeese Dep. at 91.   Jones also testified that Dr. McNeese told an official at Doane College not to send interns to ADCS or Healing Circle because Jones and the businesses were under investigation for fraud.  Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 226 (Doc # 60-8, Page ID # 689).  Dr. McNeese acknowledged speaking to a Doane College official about placement of interns, but did not recall telling him not to place interns at ADCS or Healing Circle.   Filing No. 64, Index of Evid., Ex. 1, Shiffermiller Decl., Ex. 2, Dr. McNeese Dep. at 89.

Jones contends that as a result of Dr. McNeese's actions, ADCS and Healing Circle were driven out of business.  Filing No. 60, Index of Evid., Ex. 25, Jones Dep. at 109, 265.  The evidence shows that both companies are no longer in operation.  *Id.* at 265.  ADCS closed in July or August of 2009.  *Id.* at 116, 150.  The incorporation of ADCS has lapsed. Filing No. 60, Index of Evid., Ex. 25, Jones Dep., Ex 1, Plaintiff's Answers to Interrogatories and Requests for Admission at 12 (Doc # 60-8, Page ID # 765).  Healing Circle Recovery Services was closed on October 21, 2009.  *Id.* Jones testified that he filed personal bankruptcy in connection with personal loans he incurred for the businesses.  *Id.* at 236-40.  He estimated the companies lost revenue of over $1.2 million and Jones's wages in the amount of $187,000 per year, plus bonuses, from

the loss of clients at Healing Circle and close to $200,000 in projected earnings per year from ADCS.[4]  *Id.* at 233-35.

Dr. McNeese testified that the reason he suspended Jones from the list of providers approved to receive vouchers was Jones's contact with inmates and a possible HIPAA violation.  Filing No. 64, Ex. 2, Dr. McNeese Dep. at 78.  Dr. McNeese also testified that substance abuse providers were allowed to come into community corrections facilities and make presentations on their treatment programs.  *Id.* at 80.  He also stated that the Legal Department had told him that the HIPAA violation was a nonissue.  *Id.* at 83.  Dr. McNeese characterized the suspension of Jones and his businesses from the voucher program as a mistake.  *Id.* at 91.

II.  LAW

1.  Standing

The issue of standing involves constitutional limitations on federal court jurisdiction under Article III of the Constitution, which confines the federal courts to adjudicating actual "cases and controversies."  *See Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001); *Oti Kaga v. South Dakota Hous. Dev. Auth.*, 342 F.3d 871, 878 (8th Cir. 2003).  Article III standing requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.  *Monsanto v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010).  To acquire Article III standing, "a plaintiff must have a 'personal stake in the outcome of the controversy.'"  *Potthoff*, 245 F.3d 710, 714 (8th Cir. 2001) (quoting *Baker v. Carr*, 369

---

[4] These figures are based on 12 clients at Healing Circle for inpatient treatment at $5,400 per month, followed by intensive outpatient treatment at $1,640 per month, and aftercare at $740 per month and on 22 clients at ADCS at $1,640 for six weeks of intensive outpatient treatment, followed by aftercare at $740 per month.  Filing No. 60, Index of Evid., Ex. 8, Jones Dep. at 234-35.

U.S. 186, 209 (1962)).  Article III standing is "a jurisdictional requirement, and thus 'can be raised by the court sua sponte at any time during the litigation.'"  *Pucket v. Hot Springs School Dist. No. 23-2*, 526 F.3d 1151, 1157 (8th Cir. 2008).

In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75 (1982); *Oti Kaga*, 342 F.3d at 880.  Prudential principles of standing are statutorily imposed jurisdictional limitations separate from and in addition to constitutional standing requirements.  *Davis v. U.S. Bancorp*, 383 F.3d 761, 767 (8th Cir. 2004).  "By imposing prudential limits on standing, 'the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to litigants best suited to assert a particular claim.'" *Oti Kaga*, 342 F.3d at 880 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100 (1979)); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (stating the prudential standing doctrine "embodies judicially self-imposed limits on the exercise of federal jurisdiction")).  A plaintiff may run afoul of prudential standing limits because the claim rests on the legal rights of third parties, or because the interest, though real, may not fall within the zone of interests protected by the statutory provision invoked.  *Oti Kaga*, 342 F.3d at 880.  Unlike constitutional standing, prudential standing can be waived.  *See Board of Mississippi Levee Comm'rs v. U.S.E.P.A.*, 674 F.3d 409, 418 (5th Cir. 2012); *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999); *Independent Living Ctr. of S. Cal. v. Shewry*, 543 F.3d 1050, 1065 n.7 (9th Cir. 2008); *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 749 (7th Cir.2007); *but see*

*American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357-58 (D.C. Cir. 2000) (prudential standing is non-waivable); *Community First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994) (same); *Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994) (same).

Congress "can extend standing to the outermost limits of Article III," and may "'enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.'" *Oti Kaga*, 342 F.3d at 881 (involving Fair Housing Act) (quoting *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 294 (7th Cir. 2000) and *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)). In such instances, prudential standing concerns may not close the doors to the courthouse. *Id.* Issues of corporate vis-à-vis individual or third-party standing raise prudential standing concerns. *See, e.g., Oti Kaga*, 432 F.3d at 880-81.

Generally, if a harm has been directed toward the corporation, then only the corporation has standing to assert a claim. *Potthoff*, 245 F.3d at 717 (noting a corporation is an entity separate and distinct from its stockholders and its separate entity will generally be recognized). If asserting a claim under section 1981, a plaintiff "must initially identify an impaired 'contractual relationship' … under which the plaintiff has rights."[5] *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (involving a claim under the "make and enforce contracts" clause). "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." *Id.* at 480 (stating "it is fundamental corporation

---

[5] Notably, the Supreme Court expressed no opinion on whether a corporation can maintain suit on its own behalf, but stated that the circuit courts that have addressed the issue have found that it can. *Domino's Pizza*, 546 U.S. at 473 n.1 (further noting that the Court did not "mean to exclude the possibility that a third-party intended beneficiary of a contract may have rights under § 1981").

and agency law—indeed, it can be said to be the whole purpose of corporation and agency law—that a corporation's shareholder and contracting officer has no rights and is exposed to no liability under the corporation's contracts"); *Potthoff*, 245 F.3d at 717 (holding that the shareholder standing rule applies to civil rights actions).  To assert a civil rights claim, a shareholder must show he personally has suffered a direct, nonderivative injury.  *Potthoff*, 245 F.3d 710 (involving allegations of economic injury alone).  The shareholder must show a cognizable injury that is distinct from the harm suffered by the corporation.  *Id.*

However, a corporate plaintiff, whose rights are "intimately close" to the rights of named individual plaintiffs, can assert the rights of the individual plaintiffs who have standing to sue in their own right under Section 1981, thereby establishing prudential standing.  *Oti Kaga*, 342 F.3d at 880-82 (also holding that a corporate plaintiff may establish prudential standing to vindicate the rights unnamed third parties as "a logical and more effective adversary to combat the alleged discrimination than an individual plaintiff"); *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1214 (8th Cir. 1972); *see also Thinket Ink Info. Res., Inc.*, 368 F.3d 1053, 1058 (9th Cir. 2004) (finding an African-American-owned business had prudential standing to bring § 1981 action because it had acquired imputed racial identity to place it within § 1981's zone of interest); *Howard Sec. Servs., Inc. v. Johns Hopkins Hosp.*, 516 F. Supp. 508, 513 (D. Md.1981) (plaintiff closely held corporation, wholly owned and operated by black owner had a cause of action under § 1981); *NDN Drywall, Inc. v. Custom Drywall, Inc.*, 2005 WL 1324056, *4 (D. Minn. 2005) (holding that the plaintiff corporation, who had overlapping legal and economic interests and was closely associated with its minority

sole owner and who alleged that it was the target of discrimination and sustained injury as a result, was a logical entity to bring a race discrimination claim).  Courts find it "hard to believe that the Supreme Court would deny standing to the corporation because it has 'no racial identity and cannot be the direct target' of the discrimination while at the same time it would be obliged to deny standing to the stockholders on the sound ground that the injury was suffered by the corporation and not them."  *Thinket Ink*, 368 F.3d at 1058-59 (quoting *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 705-06 (2d Cir.1982)).

Also, "there are situations where competing considerations outweigh any prudential rationale against third-party standing, and [the Supreme Court] has relaxed the prudential-standing limitation when such concerns are present."  *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984); *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (8th Cir. 2004).  "Where practical obstacles prevent a party from asserting rights on behalf of itself, for example," courts  have recognized the doctrine of *jus tertii* standing.  *Joseph H. Munson Co.*, 467 U.S. at 956.  In that situation, the court considers whether the third party has sufficient injury-in-fact to satisfy the Article III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal.  *Id*; *Kowalski*, 543 U.S. at 130 (requiring a party seeking third-party standing to make two additional showings:  a "close" relationship with the person who possesses the right, and that there is a "hindrance" to the possessor's ability to protect his own interests).

2.   Qualified Immunity

In a motion for summary judgment, the court looks at the record most favorably to the party opposing the motion, drawing all inferences for that party. *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003).  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 378-80 (relying on videotaped evidence after noting the parties' "version[s] of events (unsurprisingly) differ[ed] substantially from" each other's).

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.  *Reichle v. Howards*, 132 S. Ct. 2988, 2093 (2012). Qualified immunity defenses generally "present 'neat abstract issues of law.'"  *See Ortiz v. Jordan*, 131 S. Ct. 884, 893 (2011) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).  "'A qualified immunity ruling . . . is . . . a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.'"  *Johnson v. Jones,* 515 U.S. at 313 (noting that an appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts).  Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law, but if there is a genuine dispute concerning predicate facts material to the qualified immunity issue,

there can be no summary judgment.  *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003).

To overcome a defendant's assertion of qualified immunity, "a plaintiff must show that:  '(1) the facts, viewed in the light most favorable to the plaintiff[s], demonstrate the deprivation of a constitutional . . . right; and (2) the right was clearly established at the time of the deprivation.'"  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010); *see Murphy v. State of Ark.*, 127 F.3d 750, 754 (8th Cir. 1997) (framing the "primary qualified immunity issue of law" as "whether, in view of the facts that the district court deemed sufficiently supported for summary judgment purposes, the individual defendants' conduct was objectively reasonable given their knowledge and the clearly established law.").  In a qualified immunity inquiry, the first question is:  "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [state official's] conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The second question is "whether the right was clearly established."  *Id.*; *see* *Pearson v. Callahan*, 129 S. Ct. 808, 818-20 (2009) (noting that the order of the *Saucier* inquiry is no longer mandatory, but often beneficial); *Reichle*, 2012 WL 1969351 at *4 ("courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question whether the purported right exists at all).

Whether the law at issue was "clearly established" at the time of the alleged violation is a pure question of law.  *Turner v. Arkansas Ins. Dep't.*, 297 F.3d 751, 754 (8th Cir. 2002).  To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

Reichle, 2012 WL 1969351 at *4.  The right allegedly violated must be established, not as a broad general proposition, but in a "particularized" sense so that the "contours" of the right are clear to a reasonable official.  Id.  However, "[f]or a right to be clearly established, '[t]here is no requirement that the very action in question has previously been held unlawful,' nor that there be 'a case decided on all fours with the present factual circumstances.'"  Mathers v. Wright, 636 F.3d 396, 401-02 (8th Cir. 2011) (internal citations omitted) (quoting Vaughn v. Ruoff, 253 F.3d 1124, 1129 (8th Cir. 2001).  Rather, the court must "conclude only that, in light of preexisting law, the unlawfulness of the conduct at issue was apparent."  Mathers, 636 F.3d at 402 (quoting Anderson v. Creighton, 483 U.S. 636, 640 (1987)).

### 3.   Race Discrimination

The Civil Rights Act, 42 U.S.C. § 1981, provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  A claim against a state actor under § 1981 must be asserted through § 1983.  Artis v. Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1181 (8th Cir. 1998).  To establish a § 1983 violation, the plaintiff must show:  1) that a person has deprived him of a federal constitutional or statutory right; and 2) that the person acted under color of state law when it deprived the plaintiff of the federal right.  Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L.Ed.2d 572 (1980).  When state action is involved, a claim falls under the "full and equal benefit" clause.  Bilello v. Kum & Go, LLC, 374 F.3d 656, 661 (8th Cir. 2004).  "Under the Full-and-Equal Benefit clause [of 42

U.S.C. § 1981, a plaintiff must] allege that some sort of state action contributed to [the plaintiff's] being discriminated against." *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 838 n. 3 (8th Cir. 2004). To establish a race discrimination claim under section 1981, a plaintiff must prove, "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir.) (en banc); *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962 n.3.

Section 1981 was "meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295-296 (1976). Section 1981 define[s] "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962-63 (8th Cir. 2011) (quoting 42 U.S.C. § 1981(a) & (b)). Therefore, a plaintiff asserting a claim under the "make and enforce contracts" clause of § 1981, "must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." *Gregory v. Dillard's, Inc.*, 565 F.3d at 468-69 (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)). "Section 1981 is not, however, limited to existing contractual relationships," rather "the statute 'protects the would-be contractor along with those who already have made contracts'" and it thus applies to discrimination that 'blocks the creation of a contractual relationship' that does not yet exist." *Gregory*, 565 F.3d at 469 (internal citations omitted) (quoting *Domino's Pizza*, 546 U.S. at 476).

To prevail under either section 1981 or section 1983, a plaintiff must demonstrate intentional discrimination.[6] _Williams v. City of Sioux Falls_, 846 F.2d 509, 510-11 (8th Cir.1988). Intent can be established by either direct or circumstantial evidence. _Desert Palace Inc. v. Costa_, 123 S. Ct. 2148 (2003) (stating in civil rights litigation, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence" and noting that evidence that a defendant's explanation is unworthy of credence is circumstantial evidence that can be probative of intentional discrimination); _Torgerson v. City of Rochester_, 605 F.3d 584, 597 (8th Cir. 2010) (evidence that an explanation is unworthy of credence or that "a prohibited reason—more than the proffered reason—likely motivated the employer" can establish discriminatory intent).

In 1984, the Eighth Circuit Court of Appeals noted "[t]he constitutional right to be free from [racial or gender] discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." _Goodwin v. Circuit Court of St. Louis County_, 729 F.2d 541, 546 (8th Cir. 1984); _see_ _Thomas v. Talley_, 251 F.3d 743, 745 (noting "it is a clearly established principle of constitutional law that a government official may not discriminate on the basis of race"); _see also_ _Murphy v. State of Ark._, 127 F.3d 750, 755 (8th Cir. 1997) (stating it has been clearly established for many years that the Equal Protection Clause

---

[6] The subjective intent of the actor is generally irrelevant to the objective reasonableness test at the heart of the qualified immunity analysis—that is, determining whether the state actor's "conduct does not violate clearly established rights of which a reasonable person would have known" prong)—however, the state actor's subjective intent is relevant to determine whether the unequal treatment was intentional, as required to state a cognizable claim. _See_ _Crawford-El v. Britton_, 523 U.S. 574, 588–89 (1998); _Mathers v. Wright_, 636 F.3d 396, 401 (8th Cir. 2011). In other words, subjective intent is relevant in "determining whether a constitutional violation occurred, not whether the right at issue was clearly established." _Mathers_, 636 F.3d at 401.

prohibits a State, when acting as employer, "from invidiously discriminating between individuals or groups" based upon race) (quoting *Washington v. Davis*, 426 U.S. 229, 239 (1976)); *Piatt v. City of Austin*, 378 Fed. Appx. 466, 469 (5th Cir. 2010) (per curiam) ("[G]enerally, where the evidence is sufficient to support a claim of intentional gender or race discrimination, any immunity defense will be foreclosed").

        4.   Due Process – Liberty Interest

    "To establish a violation of procedural due process, a plaintiff must show that he has been deprived of a constitutionally protected life, liberty or property interest." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994). Liberty interests are implicated where accusations are leveled at a person that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges. *Id.* The requisite stigma has generally been found when the individual is accused of "dishonesty, immorality, criminality, racism, and the like." *Id.* (finding that allegations of child abuse are sufficiently stigmatizing to a teacher's reputation, honor, and good name in the community to implicate liberty interests); *Rush v. Perryman*, 579 F.3d 908, 913 (8th Cir. 2009) (stating that misconduct involving dishonesty is an accepted stigmatizing charge). In addition to showing that accusations stigmatized him, a plaintiff must show "'that the defendants made the reasons public.'" *Hogue v. Clinton*, 791 F.2d 1318, 1322 (8th Cir. 1986) (quoting *Payne v. Ballard*, 761 F.2d 491, 493 (8th Cir. 1985)). With regard to making the accusations public, "a personnel file replete with wrongdoing may be a sufficient publication if the file were made available to prospective employers." *Winegar*, 20 F.3d at 899 n.3. A plaintiff must also deny the substantial

truth of the charges.  *Rush*, 579 F.3d at 913 (8th Cir. 2009); *Coleman v. Reed*, 147 F.3d 751, 755 (8th Cir. 1998).

However, abstract injuries, by themselves, do not implicate the Due Process Clause.  *See Connecticut Dept. of Pub. Safety v. Doe*, 538 U.S. 1, 6-7 (2003) ("mere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty interest"); *Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991) (defamation resulting in "serious impairment" of employment prospects does not create a liberty interest in reputation).  Rather, a plaintiff must demonstrate that he has been deprived of some benefit to which he has a "legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Such an entitlement may exist where a state has established a licensing system for regulation of professionals.  *Kloch v. Kohl*, 545 F.3d 603, 607 (8th Cir. 2008); *Marler v. Missouri State Bd. of Optometry*, 102 F.3d 1453, 1456 (8th Cir. 1996).

When he has been deprived of a protected liberty interest, a person has a "procedural due process right to a name clearing hearing." *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008) (noting the right "is clearly established"); *Rush*, 579 F.3d at 912-13; *Coleman*, 147 F.3d at 755 (noting "[a] deprivation of constitutional magnitude may occur if such an employee is not granted the opportunity to clear his or her name"); *see Board of Regents v. Roth*, 408 U.S. 564, 573 (1972) (noting that where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential).  At the least, "[d]ue process would accord an opportunity to refute the charge." *Board of Regents v. Roth*, 408 U.S. at 573; *Christiansen v. West Branch Cmty. Sch. Dist.*, 674

F.3d 927, 934 (8th Cir. 2012) (holding that an employee fired under circumstances placing a stigma on his reputation is entitled to notice and a name clearing hearing). Such a hearing must occur "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970); *Rush*, 579 F.3d at 914.

### III.  DISCUSSION

#### 1.  Standing

With respect to the threshold issue of Article III standing, the court finds the corporate and individual plaintiffs have presented evidence of sufficient injuries in fact as a result of the defendant's allegedly discriminatory conduct to confer Article III jurisdiction on the court.   All of the plaintiffs have shown an actual, concrete, particularized injury traceable to defendant's actions.   The evidence shows that the plaintiff corporations were driven out of business and are now defunct.   Jones testified that he suffered significant economic injury, substantial mental distress, and an injury to his reputation that prevents him from practicing his chosen profession as a result of the defendant's allegedly discriminatory conduct.   Jones clearly has a personal stake in the outcome of the litigation, as do the corporations.

The court further finds that prudential standing considerations erect no barrier to the plaintiffs' pursuit of the claims.   In his motion for summary judgment, McNeese did not challenge Jones's individual standing at all and challenged the corporate plaintiffs' standing only for noncompliance with the Federal Rules' requirements that the caption of the complaint and the summons include all parties' names and signatures.   Because he did not raise the issue of prudential standing, the court finds that the defendant waived any prudential standing arguments he may have had.

Even if the prudential standing argument were properly presented, however, the court would find that both Bernard Jones and the corporations have standing. The evidence shows that Jones suffered injuries—a loss of salary, injury to reputation, and mental and physical distress—that are distinct from the loss sustained by the corporations and distinct from any losses he suffered as a shareholder.

Alternatively, the evidence shows the corporations and Jones were essentially a single entity, and evidence would support either piercing the corporate veil and/or finding the corporations and Jones are alter egos of each other. The corporations had been closely associated with their minority owner, Bernard Jones, who was the sole owner and President of ADSC, and whose immediate family were owners of Healing Circle. The evidence also shows that Jones had a personal stake in the contractual relationships at issue in that he was forced to file bankruptcy as a result of debts he incurred for the corporations. Jones's legal and economic interests overlap with those of the corporations. Essentially, the injuries and the remedies are the same, no matter who asserts the claims. Because the corporate entities are defunct, Jones is the logical party to maintain the suit. There would not be any duplicative recovery for the same injuries.

The Supreme Court's decision in *Domino's Pizza* does not foreclose this result because Jones's claim is premised on the "privileges and immunities" clause of Section 1981 as well as the "make and enforce contracts" clause. Under that clause, the evidence would support a finding that the state actor, with discriminatory intent, deprived Jones and the corporations of the privilege of bidding on future contractual

relationships.  Also, this case presents a situation that justifies relaxing judicially-imposed prudential standing standards.

            2.   Qualified Immunity

In resolving Dr. McNeese's claim of qualified immunity, this court is required to essentially adopt the plaintiffs' version of the facts, and then to resolve the abstract issue of law.  The evidence establishes that plaintiffs' version of the facts is not so blatantly contradicted by the record that no reasonable jury could believe it.  The legal issue is whether those assumed facts establish that the defendant violated a constitutional right that was clearly established at the time of the incident such that a reasonable official in the defendant's position would have known that his actions violated the plaintiffs' rights.  To clarify, the constitutional rights on which the plaintiffs premise their claims are:  1) the right to be free from discrimination based on race in contracting with the government to provide a service; and 2) the right not to be deprived of a liberty interest in reputation without due process of law.  As a matter of law, those rights were clearly established at the time Dr. McNeese removed Jones, ACDS, and Healing Circle from the list of approved providers in June 2009.

Viewed in the light most favorable to Jones, the evidence, if fully credited, could establish the elements of those constitutional claims.  With respect to the race discrimination claim, Jones is an African-American and his businesses have an imputed racial identity by virtue of their close association with Jones.  The protected right at issue is his right to be free from discrimination in being approved as a provider of treatment services and concomitant ability to provide treatment services to offenders

and be paid by voucher and to bid on future contracts for provision of such services and payments by voucher.

There is also evidence from which a reasonable juror could infer intent to discriminate. The evidence shows that Jones was treated differently than other Department of Corrections employees, in that he was told he could not "moonlight," while white and Middle-Eastern employees, including Dr. McNeese himself, were permitted to do so. Further, intent to discriminate could be inferred from the defendant's alleged comments that Jones, as a black substance abuse counselor, would attract black clients. At the time of the challenged conduct, Dr. McNeese's wife owned a business that competed directly with ADCS and Healing Circle for clients. Because it precluded Jones, ADCS and Healing Circle from bidding, Dr. McNeese's actions in suspending those entities from the approved provider list ultimately resulted in the award of a sole provider contract to his wife's First Step business. A jury could draw the logical conclusion that just as the defendant had once wanted to take advantage of Jones's race to benefit his wife's treatment center, the converse would also be true— that Jones's race motivated the defendant to eliminate Jones and his companies from competition for Department of Corrections vouchers. Further, a jury could credit Jones's testimony that Dr. McNeese's remarks were racist and implied that Jones had not been hired on merit. Invidious intent could also be inferred from the fact that Jones was given conflicting explanations for the removal of ADCS and Healing Circle from the approved-provider list. McNeese relied on a purported HIPAA violation to justify his action, but the evidence shows there was no HIPAA violation and Dr. McNeese knew it—the Legal Department had told him that it was a nonissue.

The evidence, viewed in the light most favorable to Jones, could also satisfy the showing required to overcome an assertion of qualified immunity with respect to Jones's due process-liberty interest claims. If credited, Jones's evidence shows that Dr. McNeese made allegations against him that were stigmatizing—alleging improprieties, dishonesty, fraud and lack of ethics. Those allegations were disseminated to and relied on by people in the position to deprive Jones and his businesses of economic benefits. The injuries to Jones's reputation were substantial and caused the loss of his businesses and livelihood. Jones had a legitimate claim of entitlement to remaining on the provider list so as to be eligible to be paid via vouchers for providing treatment to offenders. ADCS and Healing Circle had an ongoing relationship with the State and had successfully participated in the voucher program.

The right to be free from discrimination on the basis of race has been clearly established for decades, but, at the latest, it was already clear in 1984 that "every reasonable official is charged with the knowledge" that discrimination on the basis of race was unlawful. Similarly, the right to be free from a deprivation of one's liberty interest in his or her reputation was clearly established when the Eighth Circuit decided *Winegar v. Des Moines Indep. Cmty. Sch. Dist.* in 1994. Accordingly,

The Clerk of Court is directed to transmit this Memorandum Opinion on Remand to the United States Court of Appeals for the Eighth Circuit.

DATED this 5th day of July, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge